# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James H. Alesia | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1581 | **DATE** | April 10, 2001 |
| **CASE TITLE** | *Spearman Industries, Inc. vs. St. Paul Fire & Marine Insurance Co* | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ■ Trial set for on May 1, 2001 at 10:00 a.m.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment with respect to Diederich's testimony is denied [43-2]. Defendant's motion for summary judgment on Count I is denied [43-1]. Plaintiff's motion for summary judgment is denied [49-1]. Defendant's motion for partial summary judgment on Count II Bad Faith is granted [41-1].

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| ✓ | Notified counsel by telephone. | APR 11 2001 | |
| ✓ | Docketing to mail notices. | date docketed | |
| | Mail AO 450 form. | CW docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| CW | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

Document Number

65

DOCKETED

APR 1 1 2001

| | | |
|---|---|---|
| **SPEARMAN INDUSTRIES, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 00 C 1581** |
| | ) | |
| **ST. PAUL FIRE AND MARINE** | ) | **Judge James H. Alesia** |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Currently before the court are (1) defendant's motion *in limine* to bar testimony of Bruce Diederich ("Diederich"),[1] (2) defendant's motion for summary judgment, (3) plaintiff's motion for summary judgment, and (4) defendant's motion for partial summary judgment on Count II. For the following reasons, the court (1) denies defendant's motion *in limine*, (2) denies the parties' cross-motions for summary judgment, and (3) grants defendant's motion for partial summary judgment. The court addresses each motion in turn.

## I. BACKGROUND[2]

Plaintiff Spearman Industries, Inc. ("Spearman") owns the Lake Bluff Racquet Club ("Racquet Club"). At the end of May 1998, Spearman insured the building with a property

---

[1] St. Paul argues that Diederich's proposed expert testimony should be excluded because it fails to meet the standard for reliability established by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993). Although St. Paul presents this argument as part of its summary judgment motion, the court treats this as a motion *in limine* to bar Diederich's testimony.

[2] Unless otherwise indicated, the following facts – taken from the parties' Local Rule 56.1 statements – are undisputed.



damage policy issued by St. Paul Fire and Marine Insurance Company ("St. Paul"). In January 1999, Chicago experienced a severe storm that involved about twenty-two inches of snow, sixty-mile-per-hour winds, and below-zero temperatures. Following the storm, Spearman filed an insurance claim with St. Paul for damages to the Racquet Club's roof.

The structure of the building's roof is critical to an understanding of this opinion. The roof consists of four main sections: (1) the "East Gable," covering tennis courts one through four; (2) the "West Gable," covering tennis courts five through eight; (3) a flat roof, called the "Valley," which runs north-south between the gabled roofs and covers the walkway between the two sets of tennis courts; and (4) a flat roof over an attached service building on the northeast end of the building which houses the reception area, locker rooms, weight and sauna facilities, a pro shop, and offices for the staff. The courts are numbered from east to west, with Court 1 on the east end of the building and just south of the reception area. The gabled roofs together cover approximately 53,000 square feet. The Valley covers approximately 1,700 square feet. The flat roof over the service building covers approximately 7,700 square feet.

During the storm, a 3,000 square foot area of the roof was completely torn away from the southeast corner of the East Gable. In addition, after the storm, the Racquet Club suffered extensive leaking in other areas of the roof, affecting the entire facility. The leaking occurred in all four courts under the East Gable, in Court 6 under the West Gable, on the walkway under the Valley roof, in the ladies' locker room, and in the pro shop.

The parties agree that the 3,000 square foot portion – worth approximately $15,000 – is covered by the insurance policy. However, the parties dispute whether the insurance policy

2

covers the damage to the rest of the roof – worth over $200,000. Spearman maintains that the entire roof was damaged solely by the storm and, thus, all the roof damage is covered by the insurance policy. Meanwhile, St. Paul maintains that – other than the 3,000 square foot area that was completely torn off the building – the damage to the rest of the roof was caused or worsened by pre-existing wear and tear, deterioration, or defective installation, design, maintenance or repair, and thus the damage to the remainder of the roof is excluded under the policy.

Spearman has filed a two-count complaint against St. Paul. Count I seeks a declaration that Spearman has insurance coverage for damage to the entire roof. Count II seeks punitive damages for St. Paul's alleged bad faith in denying Spearman's claim. St. Paul argues that it is entitled to summary judgment because (1) absent Diederich's opinion, there is no evidence establishing that the sole cause of the damage to the roof was the winter storm; (2) Spearman's loss is uninsurable under the contract's exclusionary clause; and (3) Spearman's loss in uninsurable under the "known loss doctrine." Spearman argues that the storm constituted a contributing and proximate cause of damage to the roof and that it is entitled to summary judgment on the theory of proximate cause. Also, each party argues that it is entitled to summary judgment on Count II Bad Faith.

## II. DISCUSSION

### A. Diederich's expert testimony

As a threshold issue, the court must dispose of St. Paul's motion *in limine* to establish what evidence is admissible and, therefore, properly before this court in support of each party's motion for summary judgment. In its motion, St. Paul seeks to exclude the testimony of

3

Diederich, Spearman's alleged expert. First, the court will address Spearman's apparent noncompliance with Federal Rule of Civil Procedure 26(a)(2)(B) ("Rule 26"). Then the court will address the admissibility of Diederich's expert testimony.

### 1. Federal Rule of Civil Procedure 26(a)(2)(B)

Rule 26 requires parties to disclose the identity of any expert witness they intend to use at trial and to submit a written report prepared and signed by the witness. FED. R. CIV. P. 26(a)(2)(A); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785 (7th Cir. 2000). These disclosures must be made "at the times and in the sequence directed by the court." FED. R. CIV. P. 26(a)(2)(A). The expert witness discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case. *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000) (construing FED. R. CIV. P. 26(a)(2) advisory committee's note). *See also* FED. R. CIV. P. 26(a)(2) advisory committee's note (stating that the purpose of the expert disclosure rule is to give opposing parties "reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.").

Pursuant to Federal Rule of Civil Procedure 37 ("Rule 37"), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, *unless such failure is harmless*, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." FED. R. CIV. P. 37(c)(1) (emphasis added). Rule 37 does not require sanctions against a party if that party's violation was harmless. *Sherrod*, 223 F.3d at 613. In fact, Rule 37 "precludes the trial judge from imposing the exclusion sanction

unless it finds the party's failure to comply with Rule 26(a) was both unjustified and harmful to the opposing party." *Id.* at 612.

The determination of whether a particular violation of Rule 26(a) is justified or harmless is left to the broad discretion of the district court. *Brand Name Prescription Drugs Antitrust Litig.*, Nos. 94 C 897, MDL 997, 2001 WL 30454, at *1 (N.D. Ill. Jan. 11, 2001) (citing *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1231 (7th Cir. 1990)). In making this determination, the district court should consider the surprise or prejudice to the blameless party, the ability of the offender to cure any resulting prejudice, the amount of disruption to the trial that would result from permitting the use of the evidence, and the bad faith involved in not producing the evidence at an earlier date. *Bronk v. Ineichen*, 54 F.3d 425, 432 (7th Cir. 1995) (citing *Spray-Rite Svc. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1245 (7th Cir. 1982)).

In this case, the court ordered September 1, 2000 as the final date for all discovery, including experts. Despite this deadline for discovery, Spearman did not submit a formal expert report for Diederich.[3] *See Sherrod*, 223 F.3d at 612-13 (7th Cir. 2000) (finding that a court order setting a deadline for all discovery constitutes "other directions from the court" under Rule 26(a)(2)(C), and constitutes the deadline for disclosure of expert reports).

---

[3]In briefing their cross-motions for summary judgment, neither party mentions the fact that Spearman did not submit an expert report for Diederich. However, while reviewing the cross-motions for summary judgment, the court ordered St. Paul to submit a copy of (1) the full deposition transcript of Diederich and (2) the full expert report for Diederich. (Ct. Order dated Feb. 20, 2001.) St. Paul submitted a copy of Diederich's deposition transcript and stated that Spearman did not submit a formal expert report for Diederich. (Letter from Rory T. Dunne dated Feb. 22, 2001.)

Nonetheless, in this case, the imposition of sanctions would be drastic and unjustified considering the harmless nature of Spearman's failure to comply with the discovery order. First, while Spearman may not have provided an expert report for Diederich, Spearman did disclose Diederich as an expert, preventing the chance that unfair surprise or prejudice would hamper St. Paul's preparation of the case. *See id.* at 613 (finding that the district court abused its discretion by excluding experts pursuant to Rule 37 without any indication that the defendants had been harmed by plaintiff's discovery violation). Second, there is no evidence of bad faith on the part of Spearman. In fact, in its motion *in limine*, St. Paul does not even mention Spearman's failure to submit an expert report or object to Diederich's testimony on this basis, much less file a Rule 37 motion to exclude Diederich's testimony. Third, not only did St. Paul have ample opportunity to prepare its examination of Diederich, but St. Paul in fact already deposed Diederich, so permitting Diederich to testify would not disrupt the trial or prejudice St. Paul.

Further, Diederich's testimony is Spearman's primary – if not sole – evidence on the causation issue. Refusing to consider Diederich's testimony might necessarily entail granting St. Paul's summary judgment motion and dismissing Spearman's suit. Where exclusion of an expert witness necessarily entails dismissal of the case, the sanction "'must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction.'" *Sherrod*, 223 F.3d at 612 (quoting *Salgado ex rel. Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 740 (7th Cir. 1998)). In this case, excluding Diederich and dismissing Spearman's case clearly would be disproportionate to the harmless nature of Spearman's failure to submit an expert

report. Therefore, Diederich will not be excluded under Rule 37, and the court is free to analyze the admissibility of his expert testimony.

## 2. **Daubert**

Spearman seeks to introduce the opinion testimony of Diederich for the proposition that winter storm was the sole cause of damage to the entire roof. St. Paul argues that Diederich's testimony should be excluded because it does not meet the standard of reliability for expert testimony set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993).

As of December 1, 2000, the Federal Rule of Evidence 702 ("Rule 702"), governing the admissibility of expert testimony reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. This rule essentially codifies the principles enunciated in the cases which, under *Daubert*, 509 U.S. 579, require that expert testimony must be reliable to be admissible. *Zic v. Italian Gov't Travel Office*, No. 99 C 1242, 2001 WL 55552, at *7 (N.D. Ill. Jan. 19, 2001). In analyzing the reliability of proposed expert testimony, the role of the court is (a) to determine whether the expert is qualified in the relevant field and (b) to examine the methodology the expert used in reaching his conclusions. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)).

### a.  Diederich's qualifications

First, the court must address Diederich's qualifications.  An expert may be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. While "extensive academic and practical expertise" in an area is certainly sufficient to qualify a potential witness as an expert, *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000), "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).  Thus, a court should consider a proposed expert's full range of practical experience when determining whether that expert is qualified to render an opinion in a given area. *Ford Motor Co.*, 215 F.3d at 718.

In this case, Diederich's practical experience is extensive.  Diederich grew up in the roofing business and has worked in various phases of the roofing industry his entire life.  At the age of eighteen, he began installing shingles with his father, a roofing contractor.  After working with his father for two years, he worked on various roofing repair jobs.  He then worked twelve years in the roofing material distribution business where he sold materials to roofing and carpenter contractors and learned the properties and capabilities of different roofing materials. In 1998, he purchased Waukegan Roofing, a roofing contracting company which has been in business eighty-five years.  At Waukegan Roofing, he is employed by building owners and private parties to install roofs.  He is a member the National Roofing Contractors Association, the Midwest Roofing Contractors Association, and the Chicago Roofing Contractors Association, and he is on the safety committee of the Chicago Roofing Contractors Association. He regularly purchases the training tapes and accompanying manuals distributed by the National Roofing

Contractors Association to keep up with industry trends. In light of his practical work experience in various phases of the roofing industry, the court finds that Diederich is qualified to testify as an expert in roofing.

St. Paul further claims that Diederich's opinion is outside the scope of his expertise because it incorporates engineering and aerodynamics principles. This argument fails. Diederich's general expertise in the broad subject of roofing is enough to qualify him as an expert. *See Quinton v. Farmland Indus.*, 928 F.2d 335, 336 (10th Cir. 1991) (finding that a veterinarian need not be a toxicologist to testify on the toxic effect of a substance on cows); *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 551 (7th Cir. 1980) (finding that the trial court did not abuse its discretion in permitting geologist to testify that a blast from coal mine operations was the proximate cause of damage to the plaintiff's home even thought the geologist based his opinion on general geological principles and had little actual experience with coal mining). Diederich's lack of specialization in the specific aspect of what causes roof damage goes to the weight of his testimony, but it does not necessarily entail engineering and aerodynamic principals beyond his expertise. *See United States v. Alzanki*, 54 F.3d 994, 1006 (1st Cir. 1995) ("[w]hile the more generalized nature of the proffered testimony may temper its probative value to the factfinder, we do not think it can be said that its relevance is negated entirely."). St. Paul is entitled to cross-examine Diederich and to put its own expert on the witness stand to offer a counter opinion.

Further, the Seventh Circuit recently stated:

> The Federal Rules of Evidence, which *Daubert* interprets rather than overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be "scientific" (natural scientific or social scientific) in character. Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.

*Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (internal citations omitted). As the Seventh Circuit has acknowledged, "genuine expertise may be based on experience or training." *Tyrus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996).

### b. Diederich's methodology

Having determined that Diederich is qualified as an expert in roofing, the court now addresses the methodology Diederich used in reaching his conclusions. In analyzing whether an expert's methodology is reliable, the court should determine merely whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed." *Walker*, 208 F.3d at 587. The court's gatekeeping function focuses on an examination of the expert's methodology, while "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact ...." *Ford Motor Co.*, 215 F.3d at 718.

Although *Daubert* identifies factors to be considered when evaluating the admissibility of expert testimony – including testing, peer review, error rates, and acceptability within the relevant professional community – these factors do not establish a definitive checklist. *See United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000) (citing *Kumho*, 526 U.S. at 150). Rather, the applicability of the various *Daubert* factors depends on the particular facts and circumstances of each case. *Id.* The presence or absence of any one *Daubert* factor is not

invariably necessary or dispositive. *Kumho*, 526 U.S. at 141. *See also Ford Motor Co.*, 215 F.3d at 721 (reversing trial court exclusion of expert testimony that considered only the factor of peer review in analyzing the reliability of the expert's testimony). In some cases, the relevant reliability analysis focus upon personal knowledge or experience. *United States v. Brumley*, 217 F.3d 905, 911 (7th Cir. 2000) (citing *Kumho Tire*, 526 U.S. at 150).

Although Diederich's opinion may not be derived from "hard science," his opinions are based on his specialized knowledge of roofing and roofing materials, and his extensive practical experience endows him with the kind of expertise recognized by the Seventh Circuit. Diederich personally inspected the roof in question and – in light of his extensive practical roofing experience installing and repairing roofs, distributing roofing materials, and working as a roofing contractor – he formed an opinion as to the cause of damage to the roof. *See Brumley*, 217 F.3d at 911 (finding that an expert's opinion was based on professionally sound and reliable underlying methodology because it "was based on his extensive investigative experience."). Diederich's opinion is well within his competency as an experienced roofer. *See Kumho*, 526 U.S. at 156 (finding that "an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Again, St. Paul is entitled to cross-examine Diederich and to put its own expert on the witness stand to offer a counter opinion.

St. Paul argues that Diederich's opinions are unreliable because they are not based on any scientific, technical, or other specialized knowledge. The court disagrees. As stated *infra* Part II.A.1.a., these arguments relate to Diederich's qualifications, not to whether his methodology is reliable. St. Paul makes several other arguments that relate to the weight of Diederich's

testimony rather than its admissibility. First, St. Paul argues that Diederich's opinion is unreliable speculation and cites an excerpt of his deposition where he states, "I don't understand how." (Diederich Dep. at 17:5.)[4] Second, St. Paul argues that Diederich's opinion is an unsubstantiated conclusion because St. Paul claims Diederich bases his opinion on an assumption that the roof had no damage prior to the storm, but Diederich never inspected the roof before the storm. Finally, St. Paul argues that Diederich's opinion is based on inaccurate assumptions that the winds were in excess of seventy miles per hour (rather than sixty miles per hour), and that the modified bitumen membrane could not have been constructed with welded technology in 1988. Again, these arguments relate to the weight of Diederich's testimony, not its admissibility.

The question of whether an expert is credible or whether his or her theories are correct is a factual one left for the trier of fact to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based. *Ford Motor Co.*, 215 F.3d at 718. It is not the trial court's role to decide whether an expert's opinion is correct. *Id.* The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound. *Id.* Here, Diederich's testimony is clearly pertinent to this case and will assist the trier of fact with its analysis of what caused the damage to the roof. His many years of practical roofing experience qualify him as an expert in the field of roofing, and the methodology

---

[4] A fair reading of this excerpt – read in context – reveals that Diederich's statement refers to the wind travel across the roof, called a "microburst," which is generally not understood, and to how this microburst helped cause the competing atmospheric and air pressure conditions within and outside the building that caused the building to flex and the roof to shuffle. (Diederich Dep. at 17:1-5.) This statement does not make Diederich's entire testimony unreliable.

underlying his opinion – namely, firsthand observation combined with his extensive roofing experience – is sufficiently reliable to admit at trial. In sum, because Diederich possesses genuine expertise in roofing, and because his opinion draws on that expertise as well as his personal investigation of the roof in question, he may testify. St. Paul's arguments go not to the admissibility of Diederich's testimony, but rather to its weight, and St. Paul is free to cross-examine Diederich about the basis for his opinion.

## B.  **Summary judgment standard**

Having decided the evidentiary issues raised in St. Paul's motion *in limine*, the court now proceeds to the cross-motions for summary judgment. Summary judgment is appropriate only where "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1017 (7th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). A genuine issue of material fact exists when, viewing the record and drawing all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Smith v. Severn,* 129 F.3d 419, 425 (7th Cir. 1997).

The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp.,* 477 U.S. at 322; *Anderson,* 477 U.S. at 256. Once the moving party makes a prima facie showing that it is entitled to judgment as a matter of law, the non-moving party may not rest upon mere allegations or denials in its pleadings but must set forth specific

facts showing that a genuine issue for trial exists. *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 256-57; *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). In addition, Local Rule 56.1 specifies that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." LOC. R. 56.1(b)(3)(B).

## C. Count I – declaratory claim

### 1. St. Paul's motion for summary judgment

In construing St. Paul's motion for summary judgment, the court will draw all reasonable inferences in favor of Spearman. St. Paul argues that summary judgment is proper because (1) absent Diederich's opinion, there is no evidence establishing that the sole cause of the damage to the roof was the winter storm; (2) Spearman's loss is uninsurable under the contract's exclusionary clause; and (3) Spearman's loss is uninsurable under the "known loss doctrine."

### a. Causation

First, St. Paul argues that absent Diederich's opinion, there is no evidence establishing that the sole cause of the damage to the roof was the storm as claimed by Spearman. St. Paul's argument rests solely upon the presumption that the court should bar Spearman's expert, Diederich, from testifying. As discussed *supra* Part II.A.2., the court has determined that Diederich is qualified to testify as an expert in the field of roofing. Therefore, Spearman will be presenting Diederich's expert testimony that the winter storm was the sole cause of damage to the entire roof. In turn, St. Paul will be presenting its own experts to testify that the damage to the roof was caused, at least in part, by wear, tear, and deterioration that existed prior to the storm. Thus, clearly a genuine issue of material fact exists – namely, the actual cause of damage

to the roof. Accordingly, the court denies St. Paul's motion for summary judgment based on its argument that no evidence establishes that the winter storm was the sole cause of the damage to the roof.

### b. The exclusionary clause

Next, St. Paul argues that coverage is precluded by an exclusionary clause contained in its insurance policy. The exclusionary clause in the insurance policy states, in relevant part:

> We won't cover loss caused or made worse by:
> - wear and tear;
> - deterioration, mold, wet or dry rot, rust, or corrosion ...

(Def.'s Mem., Ex. G.) St. Paul argues that the roof's worn and deteriorated condition "made worse" the loss for which Spearman now seeks coverage because the allegedly deteriorated condition of the "pre-storm" roof contributed to the damage and leaking experienced immediately following the storm. Thus, St. Paul argues, the exclusionary clause precludes coverage.

The court need not decide whether or not the exclusionary clause precludes coverage because, as discussed *supra* Part II.C.1.a., the court has determined that a genuine issue of material fact exists as to the cause of damage to the roof. In other words, it remains a question of fact whether the storm was the sole cause of damage to the roof or whether the damage was made worse because of wear and tear experienced before the storm. Because this question of fact exists, the court need not decide whether or not the exclusionary clause precludes coverage. Therefore, the court denies St. Paul's motion for summary judgment based on its argument that coverage is precluded by the exclusionary clause.

### c.   The known loss doctrine

Finally, St. Paul asserts that coverage is precluded because the loss arising out of the damage to the roof is an uninsurable, known loss. The "known loss" doctrine is designed to protect against contingent or unknown risks of harm. *Westchester Fire Ins. Co. v. G. Heileman Brewing Co.*, No. 1-99-2566, 2000 WL 1875875, at *9 (Ill. App. Ct. 2000). In Illinois, the known loss doctrine applies if the insured knows or has reason to know, when it purchases an insurance policy, that there is a substantial probability that it will suffer or has already suffered a loss. *Id.* (finding that the known loss doctrine precluded an insured from indemnification on a policy it purchased a year after initiation of a multi-million dollar lawsuit against it). *See also Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204 (Ill. 1992) (finding that the known loss doctrine precluded an insured from indemnification on an insurance policy covering its liability for water pollution when it purchased the policy after receiving an administrative order from the Environmental Protection Agency confirming that it was releasing hazardous material into the water). To be clear, for the known loss doctrine to apply, the insured must know, at the time it purchased the applicable insurance policy, "of the substantial probability of the loss which occurred." *St. Paul Fire & Marine Ins. Co. v. Lefton Iron & Metal Co.*, 694 N.E.2d 1049, 1055 (Ill. App. Ct. 1998).

In this case, the loss which occurred is the damaged and badly leaking roof. Therefore, for the known loss doctrine to apply, St. Paul must show that Spearman knew or had reason to know, when it purchased the insurance policy in May 1998, that there was a substantial probability that Spearman's Racquet Club would suffer or had already suffered a damaged and

badly leaking roof. If the court infers that the storm was the sole cause of damage to the roof, the known loss doctrine cannot apply – Spearman could not have known or had reason to know, when it purchased the insurance policy from St. Paul in May 1998, that there was a substantial probability that it would suffer a damaged and leaking roof exclusively caused by a January 1999 winter storm. Therefore, the court denies St. Paul's motion for summary judgment based on its argument that the known loss doctrine precludes coverage.

### 2. Spearman's motion for summary judgment

In construing Spearman's motion for summary judgment, the court will draw all reasonable inferences in favor of St. Paul. Spearman argues that the storm constituted a contributing and proximate cause of the damage to the roof and that it is entitled to summary judgment on the theory of proximate cause.[5] In support of its argument that the theory of proximate cause applies, however, Spearman fails to cite any Illinois or Seventh Circuit law.

---

[5]Spearman has filed a combined "Memorandum in Support of its Motion for Summary Judgment, and in Response to St. Paul's Motion for Summary Judgment and Partial Motion for Summary on Count II." This combined memorandum is divided into three parts. Part I summarizes the facts. Part II, entitled "Response to St. Paul's Motion for Summary Judgment," addresses only St. Paul's arguments regarding the known loss doctrine, but fails to address St. Paul's arguments regarding the exclusionary clause or Spearman's evidence of causation. Part III of Spearman's combined memorandum, entitled "Response to St. Paul's Motion for Partial Summary Judgment, and in Support of Spearman Industries' Motion for Summary Judgment," contains a single subheading alleging that St. Paul's denial of coverage has been unreasonable and vexatious. Under this subheading apparently referencing the bad faith claim, however, Spearman then (1) launches into a analysis of proximate cause and how it entitles Spearman to judgment as a matter of law, (2) responds to St. Paul's arguments regarding the exclusionary clause, and (3) argues that it is entitled to summary judgment on Count II, the bad faith claim. Despite Spearman's organizational confusion, the court will assume Spearman's proximate cause analysis supports a motion for summary judgment on Count I, the declaratory claim, and is misplaced under a subheading regarding Count II, the bad faith claim.

Contrary to Spearman's assertions, in Illinois, the importation of tort principles of proximate cause into the construction of insurance policies is inappropriate. *Transamerica Ins. Co. v. South*, 125 F.3d 392, 398 (7th Cir. 1997) (citing the court's earlier withdrawal opinion). Rather, in Illinois, insurance policies are interpreted in accordance with contract principles – not tort principles – to give effect to the intent of the parties. *Id.* Therefore, insurance policies should be construed according to the plain meaning of the terms used. *Id.*

Spearman cites no precedential support for its argument that proximate cause analysis applies in construing insurance contracts in Illinois. On the contrary, the court's own research reveals that the Seventh Circuit recently stated that it is inappropriate to apply proximate cause principles in construing insurance policies. *See id.* Further, Spearman provides no argument that the plain meaning of the terms of the insurance policy indicates that the parties intended proximate cause principles to apply. Therefore, the court denies Spearman's motion for summary judgment as a matter of law.

**D.     Count II – Bad faith claim**

In construing each party's motion for summary judgment on Count II Bad Faith, the court will draw all reasonable inferences in favor of the non-moving party. Count II alleges that St. Paul acted vexatiously and unreasonably in denying coverage to Spearman under § 155 of the Illinois Insurance Code. 215 ILL. COMP. STAT. 5/155 ("§ 155"). Section 155 states in relevant part:

> (1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay

18

in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus [certain penalties]...

*Id.*

Spearman states that its bad faith complaint pertains solely to the way St. Paul handled the claim, not to the timeliness of St. Paul's conduct. Spearman supports its bad faith claim by alleging that there has never been a bona fide dispute concerning insurance coverage and that St. Paul had little or no basis to deny this quarter-million dollar claim because it had no evidence that damage existed before the storm. Spearman argues that St. Paul asserted a policy defense that had no factual or legal basis, failed to identify a genuine legal or factual issue, and ignored set law regarding the applicability of proximate cause principles to its claim.

Because § 155 is penal in nature, its provisions must be strictly construed. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000). Wrongful denial of coverage is not enough by itself to warrant statutory penalties under § 155 – rather, the denial of coverage must be unreasonable and vexatious. *Platinum Tech., Inc. v. Fed. Ins. Co.*, No. 99 C 7378, 2001 WL 109814, at *10 (N.D. Ill. Feb. 2, 2001). In determining whether an insurer is guilty of vexatious or unreasonable conduct under § 155, the court must consider the totality of the circumstances. *Id.* (citing *Buais v. Safeway Ins. Co.*, 656 N.E.2d 61 (Ill. App. Ct. 1995)). An insurer's conduct is not "vexatious and unreasonable" if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage, (2) the insurer asserts a legitimate policy defense, (3) the claim presents a genuine legal or factual issue regarding

coverage, or (4) the insurer takes a reasonable legal position on an unsettled issue of law. *Citizens First Nat. Bank of Princeton*, 200 F.3d at 1110.

Here, there is no issue of material fact regarding St. Paul's behavior in conducting its investigation and litigation of this claim. It is undisputed that St. Paul settled a portion of the claim with payments totaling over $16,000 just three months after the claim was filed, and also that – after a roofing company inspected the roof and reported that there appeared to be general wear, tear, and deterioration of the roof – St. Paul advised Spearman in a letter dated April 13, 1999 that the remaining loss was excluded pursuant to the exclusionary clause it explicitly set forth in the letter. As discussed *supra* Part II.C.1.a., there is a genuine issue of fact regarding the cause of damage to the roof. Thus, St. Paul presents a genuine factual issue and legitimate policy defense, and there is a bona fide dispute concerning the scope and application of insurance coverage.[6]

Spearman fails to present sufficient evidence to establish that St. Paul did anything more than have an honest dispute concerning its legal liability to Spearman under the insurance policy at issue. An honest dispute as to the legal obligations of the parties does not qualify as bad fad faith. *Platinum Tech., Inc.*, 2001 WL 109814, at *10. There is no evidence of bad faith, vexatious behavior, or unreasonableness on the part of St. Paul concerning its investigation, litigation, and denial of this claim. *See id.* at *22 (denying damages under § 155 when the

---

[6]In light of the fact that a genuine issue of material fact exists regarding the cause of damage to the roof, the court has denied St. Paul's motion for summary judgment on Count I. *See supra* Part II.C.1. However, if at trial St. Paul successfully demonstrates that the storm was not the exclusive cause of damage to the roof, then its arguments that the known loss doctrine or the exclusionary clause preclude coverage may have merit.

insured failed to produce evidence affirmatively demonstrating that the insurer acted vexatiously or unreasonably). Therefore, summary judgment on Count II in favor of St. Paul is necessary as a matter of law. The court grants St. Paul's motion for partial summary judgment on Count II Bad Faith and denies Spearman's motion for summary judgment on Count II Bad Faith.

### III. CONCLUSION

St. Paul's motion for summary judgment with respect to Diederich's testimony is treated as a motion *in limine* and is denied. St. Paul's motion for summary judgment on Count I is denied. St. Paul's motion for partial summary judgment on Count II Bad Faith is granted. Spearman's motion for summary judgment is denied.

APR 10 2001
Date

James H. Alesia
United States District Judge